## PICKWICK STAGE LINES, Inc., v. EDWARDS.

### No. 762.

Circuit Court of Appeals, Tenth Circuit.
April 10, 1933.

H. A. Rich, of Salt Lake City, Utah (Carl A. Badger and Benjamin L. Rich, both of Salt Lake City, Utah, on the brief), for appellant.

Willard Hanson, of Salt Lake City, Utah (Lindsay R. Rogers, of Salt Lake City, Utah, and Reuben J. Shay, of Cedar City, Utah, on the brief), for appellee.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

This is an appeal from a judgment for damages on account of personal injuries to appellee caused by her falling down a basement stairway in the Cedars Hotel at Cedar City, Utah.

Appellant was a public carrier of persons, baggage, express and freight for hire. Its means of transportation was motor buses. J. C. Carpenter, manager of the Cedars Hotel at Cedar City, Utah, was its agent there. Mrs. Edwards, appellee, became its passenger on June 13, 1931, at Los Angeles, California, having paid the required fare to Denver, Colorado. The bus in which she and several oth-

er passengers were being transported arrived at Cedar City at about 12:30 P. M. the next day and stopped in front of the Cedars Hotel; whereupon the chauffeur announced, "this is the Cedars Hotel, we will stop half an hour, you will find a rest room here and a good place to eat." A plat of the first floor of the hotel conduces to an understanding of the case, viz.:

lieving that the rest room door was back of that door, and I stepped off. So as to warn her I said, 'I am falling,' and I turned quickly in self-preservation you might say, and then I fell or jumped rather on both feet one, two, three steps and then over what seemed like three steps, and I only struck this foot that time and that whirled me around and I sat down and struck my head here, cut

When the bus stopped all of the passengers got off. Mrs. Edwards and another lady were the last to leave the bus. They went directly into the room marked "Dining Room" in the hotel, went to the lunch counter and ordered something to eat. After eating they walked to the enclosure marked "Desk" on the one side and "Hotel Register" on the other, and paid the clerk for what they had eaten. Mrs. Edwards testified:

"I said (to the clerk), 'Where is the rest room? This woman and myself wish to go to the rest room.' And he said, 'That door,' and we walked on a little way.

"Q. He said 'that door'; —did he make any motion?

"A. Just with his head. We then walked towards the rear.

"Q. Did you see the door?

"A. We walked on so we could see the door and then I stopped and looked back and I said to the clerk, 'That door?' And he said, 'Yes,' and we walked over to this door.

"We walked over to that door and I opened the door and stepped in. I stepped down one step; I stepped back in order to let her enter so we could close the door be-

me, and I don't think I lost consciousness at all because I tried to scramble to my feet and found that I couldn't, and the clerk came down; he asked me if I was hurt.

"There was no artificial light in there. It was midday. There was no artificial light in the hotel. I held on to the knob of the door until I stepped back to let the other lady in. I let go of it and I stepped back and lost my balance. I stepped off of the platform and on to nothing in the air.

"I knew we were at a hotel, and I entered directly on the restaurant side. We sat on a stool, and when we got up from the stools I walked across to the desk. The clerk was back of the desk, but I did not notice the cash register. The clerk was facing toward me and towards the stools as I walked over to him. I paid the clerk.

"I said to the clerk, 'Where is the rest room?' And he said, 'That door,' as he gave me the change. As he looked at me he just nodded his head. 'That door;' and I looked to see a door. It was the only door there, and I stopped and said, 'That door?' And he said, 'Yes.' He was still standing in the same position in the same place as when I paid

him, and I said, 'That door?' And walked where we could see the door. It was about as wide as this. I should think (indicating with her hands)—Possibly a little more, I can't tell; I didn't measure it. I would say it was at least three or four feet. I don't mean from where the clerk was standing—the door was further away than that. After speaking to the clerk I walked so I could see the door to way over here.

"The man who directed me at all times remained at the desk or counter where he was when he took my money, that is, he remained there until I was away. I don't know what he did after that. He was always at the counter at the place where he took my money when he talked to me. This was back of the desk or counter.

"The clerk was facing the café side when he talked to me. From the stools to where the clerk was standing was 16–18 or 20 feet. The clerk never at any time changed his position from where I first spoke to him until I last saw him. I only stepped a distance of probably 4 or 5 feet between the time when I spoke to him first and when I asked him, 'That door?' I had to turn to see the clerk but I could still see him at the desk. I could see no other door. I couldn't see any door when I asked him, 'That door?' We couldn't see any door. We wandered along those few steps to find a door. I couldn't see any door when I first asked him for the rest room, but when we had gone 4 or 5 feet I could see the door, and that was the only door I could see. I would say the door I referred to was about as far away as the distance from the stools to the desk where the clerk stood. That would be 15 to 20 feet. I could see the door plainly and walked directly to it. The door was a direct straight line from where I stood. When I said to the clerk, 'That door?' and he nodded his head, I was not then in the café side—yes, I was in the café side. I was still in the café side.

"There was no name or wording on the door. It was unmarked. It seemed as though the door was at the end or back of the lobby. As I remember I observed it through an alcove. I don't know that it was an alcove. It just seemed to me a small end of the room. I passed some stairs going through there. The door was under the stairs,—the door proved to be under the stairs, as I remember it. The door was beyond the stairs that I passed in going through this alcove. I could see the door from where I stood when I spoke to the clerk the second time. The stairs would have to be, I guess, between me and the door.

I didn't notice the stairs, it is very vague; I couldn't swear to that at all. There was a stairway, undoubtedly, leading upstairs. I remember seeing the stairs. I noticed the stairs first before I saw the door. I don't think the stairs leading upstairs were in the range of my vision from where I stood when I said, 'That door,' but I am not sure. I did not pass into another room in going to the place where I entered this door. It seemed to be a part of the one big room. It seemed the smaller end of the lobby, seemed like an alcove. I had to pass the desk and through the alcove, it seemed like an alcove, just my recollection of it. I know where I entered another room. It did not seem like it,—as I recollect it. It doesn't seem like a separate and distinct room from the large lobby. The stairway going up made this.

"When I opened the door I did not observe this step down. I opened the door expecting to step on the level, and instead of that I stepped down one step. I didn't look to see whether it was level. I thought I was right. I assumed I was right, that he directed me right. I didn't look to see whether it was upstairs or downstairs. It was rather a shock to me when I opened the door and took a step down the first step. I was surprised. My surprise at stepping down didn't indicate to me that perhaps there were stairs there. I never thought of it. It never occurred to me. I supposed—I assumed that I was directed correctly, and that it was all right. I assumed that the rest room was on the same level with the floor that I was on although there was nothing said with reference to that.

"The step down to the platform was about eight or nine inches. After stepping on to the platform it didn't occur to me that there might possibly be steps there. I did not look around to see what was there. I just assumed that I would have to close that door and would find the rest room door back of it. So I stepped back to let the other woman come in so we could close the door and find the rest room. And as I stepped back I stepped off. My first step was partially backwards. I had hold of the door; I stepped back to give her room to get in, supposing that the platform extended back that way. I still had hold of the door knob when I stepped back. I didn't look inside at any time, either before I entered or after getting on to the platform, and after I had been shocked by stepping down, even then I didn't look around to see what there was there."

The answer denied the negligence charged, and set up plaintiff's contributory negligence.

It is plain from the proof, so conceded by appellee's counsel, that she opened and entered the door at the rear end and on the side of the lobby, which we mark with the letter A. The step down on to the platform is about six inches, and the stairs shown go down into the basement. There was a railing on the outer side of the stairs. There was uncontradicted testimony that there were six windows in the basement, each about twenty inches square, and an outside entrance and exit. It was being used as a kitchen at the time of the accident here involved, and 'had been previously used as a billiard room. It was also proven and undenied that there are separate rest rooms and lavatories on the second floor at the head of the stairway, the foot of which is shown on the plan.

■ A wholly unsupported claim is made here by appellee's counsel that her inquiry and conversation with the clerk occurred after she had passed through the alcove at the foot of the stairs and was in the hotel lobby. Not only is it without support, but it is flatly contradicted by the testimony of appellee. She said that when she paid for her lunch the clerk was facing the café side, and that he never at any time changed his position from where she first spoke to him until she last saw him, and that she only stepped a distance of probably four or five feet between the time when she spoke to him first and when she asked him, "That door." She also said that after moving four or five feet after she first spoke to him she could see the door, that she opened it, and she stepped through on to the platform, and that it was in a direct straight line from where she stood. She also testified that she was still in the café side when she said to the clerk, "That door?" and he nodded his head. Of course, her statement that she could see the door then was a physical impossibility. The only door that she could see from where she placed herself and companion, while conversing with the clerk, was the door on the café side at the foot of the stairs leading to the second floor.

There was no proof corroborating Mrs. Edwards' testimony in reference to her inquiry about the rest room and the directions given her, and her testimony was self-contradictory and incredible in view of the physical facts. Moreover, there was proof that the clerk told her the rest room was upstairs. And how incredible that he would give erroneous directions in that respect! What possible motive or reason for doing so. None is suggested. The court erred in denying defendant's motion for a directed verdict at the close of all the evidence. And then it erred in giving this instruction to the jury:

■ "Under the evidence in this case I charge you gentlemen that the defendant, the Pickwick Stage Lines Company appropriated the rest rooms in the Cedars hotel for the use of its passengers and that it thereby became its duty to exercise reasonable care to make and keep the building in which the rest rooms were located, namely, the hotel, in a reasonably safe condition for such use by its passengers, who in fact made use of the rest rooms in the building."

There was no proof of any agreement between appellant and the owner of the hotel concerning the use of hotel privileges by passengers. There was no understanding between them shown for the furnishing of meals or lunches to passengers. The facts leave only one conclusion in that respect,—that passengers were free to enjoy hotel privileges as any others of the public who might care to do so. There was nothing whatever indicating that appellant had obligated itself in any respect to keep the building in a reasonably safe condition for its passengers. Nor is there proof that building and the rest rooms in the hotel were not in a reasonably safe condition for use. There was no rest room in the basement. The proof shows there were two rest rooms on the second floor, one for ladies and one for men, and there is not a word of testimony that they were not in proper condition for use. The only charge in the complaint which appellee weakly sought to sustain and failed was that appellant carelessly and negligently directed appellee to a dangerous place, trap and pitfall when she inquired for a rest room, to-wit, the door that leads to the basement. Moreover, if both law and proof sustained the negligence of appellant charged, it conclusively appears from Mrs. Edwards' testimony that she was guilty of contributory negligence preventing recovery. She testified:

"The step down to the platform was about eight or nine inches. After stepping on to the platform it didn't occur to me that there might possibly be steps there. I did not look around to see what was there. I just assumed that I would have to close that door and would find the rest room door back of it. * * * I didn't look inside at any time, either before I entered or after getting on to the platform, and after I had been shocked by stepping down, even then I didn't look around to see what there was there."

Thus, in a strange place, she opened a door, stepped through without looking, and

though shocked or surprised by her step down to the platform, she didn't even then look around to see what there was there. De Honey v. Harding (C. C. A.) 300 F. 696; F. W. Woolworth Co. v. Davis (C. C. A.) 41 F.(2d) 342.

The relation between appellant and appellee was that of carrier and passenger. Appellee's counsel cites no authority sustaining the proposition that that relation continued while appellee was in the hotel. Texas & P. Ry. Co. v. Mangum, 68 Tex. 342, 4 S. W. 617, 619, is an authority contra. In that case one Ginocchio leased ground from the railway company contiguous to the company's platform where its trains stopped. The matter complained of by the plaintiff was a defective door step to Ginocchio's restaurant which he erected on the leased ground. The court said:

"The fact that Ginocchio leased the ground from the railway company, and that the buildings erected by him on it were used as an eating-house, at which, on account of its nearness to the railway depot, travelers and its employees frequently took their meals, did not impose upon the railway company any duty to keep in repair or well lighted the passage-way to the house, any more than would such duty have been imposed had the house been erected on ground owned by Ginocchio. Those who entered the eating-house did so under the implied invitation given them by its keeper and owner, and not upon any invitation extended to them by the railway company; and in such case the tenant, and not the landlord, would be liable for any injury resulting from defects in the rented premises. * * * There was nothing in the contract to lease which could change this general rule."

We find no other case in point on the facts.

■ There is another ground which requires reversal. While the jury was being impaneled counsel for Mrs. Edwards made this statement:

"I am advised that the defendant Pickwick Stage Lines has several policies of insurance against liability upon the cause of action sued upon, as well it might do. I ask your Honor to ascertain from counsel the names of these several companies and their local management."

Counsel for defendant, appellant here, at once objected to the statement and asked that the jury be discharged. The court declined to sustain defendant's counsel in his objection and request, but on its own motion proceeded to ask the jurors if any of them were agents for such insurance companies. The clerk at the hotel on the occasion in question was residing in Los Angeles at the time of the trial. He was a witness for appellant. On his cross-examination by appellee's counsel the court permitted him to testify that he was sent to Cedar City from Los Angeles by the Zurich Insurance Company; that its representative gave him a railway ticket and $10.00 expense money. During the argument to the jury appellee's counsel said:

"You know who Mr. Schoppe testified gave him the money and the round-trip ticket and sent him here. He said it was an insurance company. What has the insurance company got to do with this case? Why is it sticking its nose in the business which doesn't concern it? What interest has the Zurich Insurance Company got here? * * *

"Who is this Zurich Insurance Company? What is it meddling in this lawsuit for, where it is not named as a party? You know. I don't know. * * *

"So far as the record in this case shows, he is the only witness who has taken money from the Zurich Insurance Company."

He made other references to the insurance company. Counsel for appellant took exceptions to these remarks and requested the court to instruct the jury to disregard them as wholly immaterial and improper for their consideration. The court declined to so charge, and exception was taken. The purpose of counsel for appellee is obvious. His own statement shows that he knew it was immaterial and irrelevant.

In Brooke v. Croson, 61 App. D. C. 159, 58 F.(2d) 885, 886, the Court of Appeals of the District of Columbia said in a similar situation:

"Such evidence is not relevant to the issue of negligence, and can have no effect but to induce a verdict based on the fact that an insurance company, and not the defendant, must pay the award."

In Akin v. Lee, 206 N. Y. 20, 99 N. E. 85, Ann. Cas. 1914A, 947, the Court of Appeals of New York said of such irrelevant facts:

"Such evidence almost always is quite unnecessary to the plaintiff's case, and its effect cannot but be highly dangerous to the defendant's; for it conveys the insidious suggestion to the jurors that the amount of their verdict for the plaintiff is immaterial to the defendant."

The court in Curran v. Lorch, 243 Pa. 247, 90 A. 62, 63, said:

"Testimony of this character is an invita-

tion to find a verdict on false grounds and that such practice is condemned not only in Pennsylvania but in other jurisdictions."

This court considered the subject at length in F. W. Woolworth Co. v. Davis, 41 F.(2d) 342, and also reached the conclusion that getting before the jury the impression that a defendant has liability insurance is prejudicial and reversible error. Cases from many jurisdictions, state and federal, are there cited.

Reversed and remanded.